IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KATHERINE STEWART**<br>**Pirmasenser Strasse 27B**<br>**Kaiserlautern, Germany 67655** | )<br>)<br>)<br>) |
| **Plaintiff,** | )<br>) |
| v. | ) Civil Action No. _____ |
| **ROBERT M. SPEER, ACTING SECRETARY,**<br>**U.S. DEPARTMENT OF THE ARMY**<br>**105 Army Pentagon**<br>**Washington, DC 20310-0105** | )<br>)<br>)<br>)<br>) |
| **Defendant,** | )<br>) |
| Serve: | )<br>) |
| **UNITED STATES ATTORNEY'S OFFICE**<br>**FOR THE DISTRICT OF COLUMBIA**<br>**Attn: Civil Process Clerk**<br>**555 4th Street NW,**<br>**Washington, D.C. 20530**<br>*Via Certified Mail* | )<br>)<br>)<br>)<br>)<br>) |
| **UNITED STATED ATTORNEY GENERAL**<br>**950 Pennsylvania Avenue NW**<br>**Washington, DC 20530**<br>*Via Certified Mail* | )<br>)<br>)<br>)<br>) |
| **JAMES MATTIS, SECRETARY,**<br>**U.S. DEPARTMENT OF DEFENSE**<br>**1400 Defense Pentagon**<br>**Washington, DC 20301-1400**<br>*Via Certified Mail* | )<br>)<br>)<br>)<br>)<br>) |

<u>CIVIL COMPLAINT FOR EQUITABLE RELIEF</u>

1

Plaintiff Katherine Stewart brings this suit against the U.S. Department of the Army ("Army" or "Agency").  The Agency employs Stewart as an Attorney Advisor for the 598th Transportation Brigade ("598th BDE").

Per an Equal Employment Opportunity Commission ("EEOC") Administrative Judge's order, the Agency and Stewart were actively engaging in settlement discussions.  On September 19, 2017, after Stewart provided her settlement demand but before the Agency provided its settlement response, the Agency abruptly decided to abolish her position.

Stewart seeks to enjoin the Agency from abolishing her current position as an Attorney Advisor.  Stewart brings her action to maintain the *status quo* while her claims proceed through the EEOC administrative process.  Stewart does not bring the instant action to redress the Agency's numerous, underlying acts of discrimination, harassment, and retaliation.

## PARTIES

1.      Plaintiff Katherine Stewart is a United States citizen, a resident of Kaiserslautern, Germany in accordance with the NATO Status of Forces Agreement (NATO SOFA) and a current employee of the Agency.

2.      Stewart is an "employee" as defined in Title VII of the Civil Rights Act of 1964.

3.      Defendant the Department of the Army is a government agency in a military department with the U.S. Department of Defense.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331, as there is a federal question that arises under the laws of the United States, specifically 42 U.S.C. § 2000(e), *et seq.*

5.      Venue in this district is appropriate pursuant to 42 U.S.C. § 2000(e)-5(f)(3) as the named Defendant and the United States Government is headquartered in the District of Columbia.

## PARTIES

6.      Stewart is currently employed as an attorney at the 598th BDE in Sembach, Germany.

7.      Stewart has been employed as an attorney for the Army since 1995.

8.      Stewart is a female.

9.      Defendant Department of the Army maintains its headquarters in Washington, D.C.

## FACTUAL ALLEGATIONS

10.     In 2006, Stewart was promoted to a GS-14 pay grade.

11.     In 2010, Stewart entered into a Negotiated Settlement Agreement with the Agency as a result of prior EEO activity related to discrimination based on sex, age, and retaliation, including a sexual harassment claim.

12.     Since that time, the Agency has engaged in an ongoing pattern and practice of discrimination, retaliation, and hostile work environment harassment towards Stewart.

**The Agency continues to assign Stewart GS-14 work,
but grades her at the GS-13 level.**

13.     As part of the terms of the agreement, Stewart was to be reassigned as a GS-13 on July 4, 2010, and to perform workload commensurate with that grade.

14.     The Agency had agreed to remove the GS-14 performance-level workload.

15.     However, on July 4, 2010, this was not done; and, everything remained status quo.

16.     In June 2012, the SDDC Commanding General (CG) Tom Richardson authorized the return of the attorney and paralegal billets to the BDE TDA. Stewart received a Management Directed Reassignment (MDR) to Germany as a GS-14/09 when the BDE relocated from the Netherlands to Germany.

17.     However, upon her relocation to Germany and despite the CG's instructions, the management officials named in Stewart's former and instant EEO complaints refused to return the Attorney and Paralegal billets to the BDE.

18.     Also, despite the MDR, these same management officials refused to implement the MDR and assign her to the GS14 grade even though there was no material change to her duties since 2006.

19.     Stewart continues to perform at the full performance level of a GS-14 to this day.

**On or about May 29, 2013, the Agency informed Stewart that the attorney position would not be on the Brigade Table of Distribution and Allowances effective October 2013.**

20.     Further, on or about May 29, 2013, the Agency informed Stewart that there would not be a GS-14 attorney billet on the Brigade Table of Distribution and Allowances ("TDA") effective October 2013.

21.     Stewart's position has not been against an attorney TDA billet since 2010, either at the Surface Deployment and Distribution Command ("SDDC") or at the 598th BDE.

22.     The SDDC TDA billet that Stewart's position was against prior to it being removed from the BDE in October 2010 continues to be at SDDC, but new individuals who are not performing Stewart's workload have been assigned against it.

23.     Although the GS-14 position/billet was moved, the workload remained at the BDE for Stewart to perform.

4

24.     The lack of a TDA billet places Stewart in a vulnerable situation, because without

an authorized billet for the Agency to properly fund her position, the BDE will be required to

terminate her from Federal service should it not be able to find other funding sources.

**On October 23, 2013, the Agency reclassified Stewart's duties as GS-13, but actually
reclassified her position as "Emergency Essential" and also changed her reporting
structure.**

25.     On October 23, 2013, the Agency, through Virginia King, the SDDC HQs

Director of Personnel and a responsible management official whom Stewart had named in her

former and pending Equal Employment Opportunity ("EEO") complaints, issued Stewart a new

SF-50 claiming to re-classify her current duties as a GS-13.

26.     This reclassification was not approved by Stewart's supervisory chain of

command and actually changed Stewart's position as "Emergency Essential," allowing for

reassignment, mobilization, and deployment into a warzone during wartime.

27.     King also named herself as Stewart's supervisor on the reclassification form in

place of her actual supervisor, COL Matthew Redding.

**Starting in 2013, the Agency refused to provide Stewart with adequate paralegal support.
In 2014, the Agency marginalized Stewart's ability to perform supervisory duties.**

28.     From on or about January 25, 2013, and continuing to the present, the Agency

refused to provide Stewart with paralegal support for the Brigade legal mission.

29.     When Stewart was authorized to hire a paralegal in June 2013, the Agency

undermined and marginalized her ability to perform her supervisory duties and responsibilities

related to her management of her paralegal, exclusion from access to necessary information, and

redirection of duties to other personnel.

30.     Beginning on or about May 7, 2014, and continuing through the present, the

Agency, by and through its management officials—Robert Johnson, Dan Brown, Virginia King,

and Amy O'Connor—has undermined and marginalized Stewart's ability to perform her supervisory duties and Command Judge Advocate responsibilities related to her management of her paralegal, exclusion from access to necessary information, and redirection of duties to other personnel.

31.     For example, Stewart has been obstructed by the management officials when attempting to discipline her subordinate paralegal, Daryl Daniels.

32.     On one occasion, Stewart's attempts to discipline her employee were continuously blocked until her male supervisor interfered.

33.     Stewart was also been kept out of communications regarding her subordinate's discretionary emergency leave from employment and extension of term appointment.

34.     Furthermore, BDE Personnel Director Daniel Brown was listed as Daniels's supervisor on a job application instead of Stewart (Brown was never Daniels' supervisor), ensuring Stewart was not contacted as a reference for the position and was unaware of her subordinate's potential departure from the Agency.

35.     On or about June 3, 2015, the Agency attempted to deny Stewart the paralegal support necessary for successful completion of her duties and undermined her authority by instructing the Personnel Office to process a 3-month appointment for Daniels rather than process an already approved 24-month appointment.

36.     When Stewart requested information regarding the truncated extension, BDE Resource Manager Jasmine Liburd and Brown were angry that she discovered their plan to shorten the appointment and treated her with hostility and disrespect within the hearing distance of other BDE employees.

37.     Then, in March 2016, Stewart's paralegal, Daniels, departed the BDE, and on or about May 31, 2016, the Agency disapproved any hiring actions related to replacing Stewart's paralegal support even though the workload remained and CG Susan Davidson had approved the paralegal for another two-year term appointment through June 2017.

38.     Stewart received an email from the organization's Personnel Office in which Stewart was informed that the position was only valid until June 2016.

39.     This was a misrepresentation of Davidson's previous order and the fact a two-year term appointment was, by definition, in two-year increments.

40.     Therefore, the paralegal's position could not have ended in June 2016.

**Starting in January 2015, the Agency prevented the Commanding General from being briefed on Stewart's higher-level duties, creating the impression that Stewart's performance and workload were deficient.**

41.     Further, beginning on or about January 15, 2015, and continuing through the present, the Agency, by and through David Crawford and Amy O'Connor, deliberately prevented CG Davidson from being briefed on Stewart's higher level duties.

42.     This created the impression that Stewart was not performing duties at the GS-14 level and was otherwise deficient in the duties she performed.

43.     Major General Davidson testified during a deposition during the administrative processing of Stewart's EEO complaint that she assumed that all areas of law briefed to her during a Command Inspection Program ("CIP") fully represented the areas of law for which the particular office was responsible.

44.     Charles Hayes, SDDC Deputy Counsel, admitted during his deposition that Stewart's work was unique, as she dealt with a variety of legal issues that arose at the 598th

BDE, including international law, foreign litigation, and transportation in a foreign environment whereas other SDDC attorneys generally specialized in only one or two areas of law.

45.     Nonetheless, Crawford did not brief all of Stewart's functional areas as is standard procedure during a Command Inspection, claiming he used his own judgment to decide which of Stewart's duties the Commander should or should not be briefed on.

46.     Furthermore, Crawford had not conducted an inspection of Stewart's legal office and, as such, the ratings and comments were a misrepresentation.

47.     However, in late 2014 and late 2015, instead of adding a GS-14 attorney billet to the BDE TDA, SDDC Deputy Counsel Charles Hayes hired three new probationary attorneys and assigned the three vacant GS-14 attorney billets to these individuals, even though Stewart was SDDC's most senior attorney and had been employed by SDDC BDE for more than 20 years.

48.     As a result of the CIP report that misrepresented many facts, four months later, in April or May 2015, COL James Dorn visited the BDE in Germany to fully examine Stewart's legal mission.

49.     Once again, the workload was validated for the GS-14 attorney position and the paralegal support.

50.     In 2015, COL Dorn then reported that the GS-14 attorney position has been off the BDE TDA for too many years and that this was not in accordance with Army standard operating procedure and must be added back onto the BDE TDA.

51.     Subsequently, in October 2015, CG Davidson informed Stewart that the decision had been made to retain the BDE Legal Office due to the unique mission set and Stewart's specialized knowledge for the BDE's AOR in Europe and Africa.

52.     Regardless of the CG's decision, SDDC Management Officials who were named in Stewart's former and instant EEO complaints, again refused to return the GS-14 attorney and GS-9 paralegal billets to the BDE TDA.

**In October 2016, the Agency refused to inspect all aspects of Stewart's job responsibilities as part of the 2016 CIP, thus misrepresenting her job.**

53.     On or about October 4, 2016, CPT Barrett informed Stewart, via email, that he will be conducting the legal part of the CIP virtually and sent Stewart a checklist of the items that he would be inquiring about during his inspection.

54.     This list was different than it had been during the 598th Transportation Brigade's previous Command Inspections, and Stewart signaled the discrepancies to CPT Barrett in an email on or about October 11, 2016.

55.     At that time, Stewart also sent CPT Barrett the CIP inspection checklist that had been used to inspect her office in years past.

56.     In response, CPT Barrett informed Stewart that the checklist he had sent was being used for all Brigades so as to streamline the process and to ensure that Brigades have access to adequate legal support.

57.     Nonetheless, the other Brigades, two of which are located in the U.S., do not have an attorney on-site.

58.     The 598th Brigade has had an attorney on-site for more than twenty-two (22) years due to varying differentials (i.e., approximately 3500-mile distance from SDDC HQs in IL; the seven-hour time difference; and, the complexity of issues in a foreign environment), rendering  the work conducted by Stewart as much more complex and covering a broader array of issues.

59.     For example, Stewart offers legal support in areas of international law, foreign litigation, transportation law, as well as other overseas-centric issues, all topics that were not inspected during the 2016 CIP, as they were not listed on CPT Barrett's checklist.

60.     Despite Stewart's requests to follow the Army regulations for CIPs, recommending that CPT Barrett conduct the 2016 CIP Inspection by using the same CIP checklist that has been used for over ten (10) years to inspect her Brigade's Legal Office, CPT Barrett did not do so, thus failing to inspect all of Stewart's professional responsibilities.

61.     The purpose of CIPs is to help Commanders identify deficiencies in standard operating procedures, resources, so that they can solve problems. If all areas of Stewart's legal program are not inspected, then the problems cannot be identified and a Commander will not have an opportunity to fix those problems.

62.     Stewart asked CPT Barrett why he was not using the checklist to inspect all areas since the BDE Commander relies heavily on these inspection reports to determine how s/he can shore up deficiencies in his overall mission, CPT Barrett replied, "I just do what I'm told."

63.     The responsible management officials were using the October 12, 2016, CIP checklist, which did not include the majority of Stewart's workload and did not list several functional areas of law for which she is responsible.

64.     This was done as a means to misrepresent to the new SDDC Commanding General Kurt Ryan and the new Staff Judge Advocate, LTC Stacy Flippin, and other SDDC and Army decision makers that Stewart's attorney position is not required and therefore must not be added to the FY 2017 BDE TDA.

65.    This was also reflected in the CIP Final Report, which omitted the majority of Stewart's workload to make it appear that the Brigade could receive its legal support from other Army organizations in Germany that are not connected with SDDC.

66.    This report was clearly misleading and gave the impression to the decision-makers that a lawyer was not required at the BDE in Germany.

67.    However, there is minimal support that can be obtained from these organizations and they are already leveraged to the degree necessary to supplement Stewart's legal mission (i.e., military justice).

68.    These other organizations do not include SDDC lawyers and not intimately familiar with the organization's mission.

69.    The legal work would have to come from all over Europe (Germany, Italy, Belgium, etc.) and one lawyer would have to oversee, manage, and make decisions for the Brigade from the Brigade location.

70.    These other organizations are not experts in transportation law or the type of overseas-centric issues that the Brigade handles (SDDC is independent of these organizations).

71.    In addition, they have not been willing to absorb the 598th Brigade Legal Mission without SDDC's agreement to transfer Stewart's GS-14 TDA position to their TDA.

72.    They have agreed in the past to place Stewart against that GS-14 TDA position and she could be supervised by their SJA and exclusively assigned and located at the Brigade to perform SDDC and 598th Brigade legal mission work. However, when this was proposed, SDDC Management Officials refused to accept the proposal.

73.    This truncated report, which has misrepresented Stewart's mission and workload, is being used yet again to persuade the new SDDC CG Kurt Ryan, to support the management

officials' decision to not add the BDE attorney position to the FY 2017 and subsequent BDE

TDA drafts so as to influence Army and SDDC decision makers to remove Stewart from the

Brigade and/or Federal service at some point in the future.

74.     These actions were not only discriminatory and retaliatory, but also used as a

pretext for future actions against Stewart.

**On or about October 1, 2016, when the Agency issued the new TDA for FY 2017,
the Agency undermined Stewart's workload and need for paralegal support
by not listing Stewart's position on the Brigade's TDA.**

75.     The TDAs are manning documents issued each fiscal year, on or about October 1

for the following fiscal year and are prepared up to two years prior to the execution date.

76.     Despite Stewart's workload, level of responsibilities and broad range of duties,

Stewart's position is not listed on the newly issued TDA for fiscal year 2017.

77.     Stewart's position has not been listed on her Brigade's TDA for up to seven (7)

years now.

78.     This is despite manpower surveys, other internal validations, and decisions by

SDDC Commanding Generals and Staff Judge Advocates (after previous misrepresentations by

Management Officials named in Stewart's former and instant complaints were clarified) and that

there is a continuing requirement for the level of responsibilities and array of duties that Stewart

is performing; the fact that there must be an attorney to manage all the Brigade legal work; and,

that Stewart is the best Army candidate for performing these duties because of her years of

experience and specialized knowledge in these areas of law.

79.     For example, every Brigade Commander since 2010 has validated Stewart's

workload and argued Stewart's position should be listed on the Brigade's TDA as a GS-14

attorney position with GS-9 paralegal support.

80.     Nonetheless, the Agency continues to discriminate and retaliate against Stewart by undermining her responsibilities and workload in CIP inspections and other documents so as to avoid adding her to the Brigade's TDA as a GS-14 attorney position with GS-9 paralegal support.

81.     The Agency has, however, authorized TDAs for all other SDDC attorneys, some of which are relatively new to SDDC—one had approximately six months of experience as a practicing attorney; most are younger than Stewart; many have far less experience than Stewart and do not have the same level of responsibility as Stewart; some were merely part-time employees; and/or, were merely teleworking.

82.     The Agency did not, however, add Stewart's GS-14 attorney position back on the TDA, even though CG Davidson had made the decision to retain Stewart's position at the Army's 598th Transportation Brigade in Germany and the SDDC G1 (Army Personnel Office) had been instructed to add Stewart's position to the 2017 BDE TDA.

83.     The Agency management officials have proceeded with this action regardless of the 2010 manpower survey that validated the GS-14 attorney workload and the GS-9 workload at the BDE; the validation of that workload by every BDE Commander since 2010 (COL William Moseley, Acting Commander Steve Marshall, COL Matthew Redding, COL Layton Dunbar, Jr., and COL Curt Stewart); and, SDDC SJA COL Dorn's on-site evaluation in April-May 2015 also validating the requirement to retain Stewart's GS-14 attorney position and the paralegal position.

84.     Aside from this action being discriminatory and retaliatory, it also placed Stewart in a compromising situation, as her position was more at risk for being eliminated, despite the continuing workload, in the absence of a TDA authorization for her position.

**From about December 2016, the Agency continues to undermine
Stewart's supervisory authority by circumventing her in communications with clients.**

85.     On or about December 9, 2016, Kim Dixon, a relatively new attorney at SDDC

HQ in Illinois, sent an email directly to the 598th BDE Commander, regarding the OGE 450

Program; and, merely copied Stewart on the email even though Stewart has been, and still is,

responsible for the BDE's OGE 450 Program for more than twenty-one (21) years.

86.     The 598th is currently the only BDE in which an attorney, Stewart, has been

assigned.

87.     Furthermore, Dixon, at Hayes's instruction, then acted in a supervisory capacity

over Stewart and assigned her certain tasks to complete, even though Stewart has been

overseeing the BDE's program successfully for more than twenty-one (21) years and there has

been no change to her duties.

88.     Stewart explained to Dixon, via email, that Dixon's direct communication with

Stewart's client was inappropriate, was causing confusion, and was a duplication of efforts.

89.     On February 14, 2017, Dixon informed Stewart that she was acting at the

direction of her supervisors.

90.     Then, a few days after Stewart filed an EEO complaint, on February 16, 2017,

Hayes, Dixon's supervisor, emailed Stewart with regard to her email communications with

Dixon.

91.     Hayes instructed Stewart to "discontinue [her] unproductive line of

communication" with Dixon and threatened an after-action report.

92.     Hayes then instructed Dixon not to respond to any further emails from Stewart.

93.     Furthermore, in and around December 2016 and continuing to the present, there

have been discussions between SDDC legal staff and the BDE Commander and the BDE Deputy

Commander regarding legal issues that are Stewart's responsibility (i.e., oversight of the BDE legal mission as a whole) and from which Stewart has been left out.

94.     This was yet another attempt by the same Agency management officials who have been involved in Stewart's former and pending EEO complaints to marginalize her duties and to give the appearance that Stewart does not perform at the GS-14 level.

95.     However, the majority of Stewart's duties and responsibilities have not changed since 2006 when she was promoted to a GS-14.

96.     These duties and responsibilities continued to remain the same even after September 2012, when she received a management-directed reassignment to a GS-14 attorney position in Sembach, Germany.

**From February 3, 2017, and continuing through the present, the Agency continued to retaliate, discriminate, and create a hostile work environment by failing to properly process Stewart's underlying complaint during the informal EEO process.**

97.     Stewart filed an informal EEO complaint with the Agency's EEO office on February 3, 2017, and the Agency assigned the investigation to Steven Matkowksy on that same day.

98.     On February 21, 2017, Matkowsky, without having conducted an interview with Stewart, informed Stewart's attorneys that EEO counseling was complete and subsequently issued a Notice of Right to File Formal Complaint ("Notice").

99.     That same day, Stewart's counsel inquired how counseling could be complete if Stewart was never interviewed.

100.     Matkowsky claimed that, in the cover letter accompanying the informal EEO complaint, Stewart's attorney instructed Matkowsky to have no contact with Stewart.

101.    Nonetheless, on February 22, 2017, Stewart's attorneys explained to Matkowsky that the cover letter that accompanied the informal complaint simply stated that any communication or requests for communication with Stewart should be directed to Stewart's attorney.

102.    Also on February 22, 2017, Stewart's attorneys reassured Matkowsky that it was Stewart's intent to participate in informal counseling and that she remained ready, willing, and able to do so.

103.    The only instruction was that a request for such counseling be directed to Stewart's attorney and not to Stewart directly, which is commensurate with Stewart's right to representation.

104.    Further, on February 21, 2017, Matkowsky also informed Stewart that the Notice would direct her to file a formal EEO complaint with SDDC Scott Air Force Base EEO Office.

105.    This deviated from the standard procedure, in place for over twenty (20) years, which has been for the local Army EEO offices in Europe (i.e., Germany) to manage EEO complaints for the 598th BDE.

106.    That same day, and again on February 22, 2017, Stewart's counsel informed Matkowsky that a conflict of interest would arise, as outlined in paragraph 1-24 of Army Regulation 690-600 and in EEO MD-110, Ch. 1, Sec. IV, if the formal complaint would be processed by the SDDC Scott Air Force Base EEO Office.

107.    The conflict of interest would arise mainly because Stewart has named SDDC employees from the Human Resources, EEO, and Legal departments in her March EEO 2017 complaint, an ongoing complaint before the EEOC, and a previous complaint.

108.    Although Matkowsky acknowledged Stewart's request to have the Kaiserslautern EEO office process her formal complaint, he did not amend the Notice pursuant to Stewart's request.

109.    Also, the informal processing of the EEO complaint was improper because, in reaching a determination that Stewart's claims could not be resolved at this informal stage, Matkowsky relied upon unsigned, incomplete (i.e., pages of statements were missing) and inadequate witness statements from the management officials named in the underlying EEO complaint.

110.    Furthermore, Matkowksy did not ask Stewart whether she had any witnesses or documents that would support her complaint.

111.    Finally, the DA Form 7510 completed by Matkowsky as part of his Counselor's Report and sent to Stewart's attorneys along with the Notice of Right to File a Formal Complaint was inadequately completed, further discrediting the informal EEO process.

112.    For example, Matkowsky incorrectly identified the date of initial contact with the EEO office in Section I.12, (which should reflect Stewart's January 26, 2017, initial contact and be back-dated to November 2, 2016); falsely asserted in Section I.16 that a pre-complaint intake interview was conducted on February 6, 2017, when no such interview took place; claimed in Section IX that the matter was determined not appropriate for Alternate Dispute Resolution ("ADR"), which was never discussed with Stewart; and falsely asserted in Section XII that a final interview was conducted on February 21, 2017, when no such interview took place.

113.    Although Stewart sought to amend her formal EEO complaint to include a claim based on the improper processing of her complaint, the Agency denied Stewart's request.

**During judge-mandated settlement discussions,**
**the Agency provided notice that it intended to abolish Stewart's position.**

114.    Meanwhile, on July 26, 2017, the Administrative Judge in Stewart's EEOC complaint denied a motion for summary judgment filed by the Agency on December 12, 2016, and which sought the dismissal of claims of discrimination and retaliation that have been identified in paragraphs 10 through 37 of this complaint.

115.    On September 6, 2017, the Parties engaged in a prehearing conference related to Stewart's claims in the EEOC to discuss, among other prehearing matters, the possibility of settlement.

116.    At that time, the Parties were ordered to exchange settlement offers following the conference. Stewart was to inform the Agency of her settlement position on or before September 11, 2017, and the Agency was ordered to respond to Stewart's settlement position on or before September 21, 2017.

117.    In accordance with these orders, Stewart contacted the Agency, through counsel, stating her demand for settlement of her claims against the Agency.

118.    The settlement demand included, among other itemized demands, that the Agency (1) correct Stewart's pay grade from GS-13 to GS-14/10 retroactively effective on July 4, 2010, and (2) place Stewart against a GS-14 TDA position/billet/authorization on the 598th BDE TDA.

119.    The Agency was to respond on or before September 21, 2017, with its counteroffer.

120.    But on September 18, 2017, Stewart received a memorandum from Clay G. Carter, the SDDC Personnel and Logistics Director, informing Stewart that her "current position of Attorney Advisor (General), GS-0905-13, in Sembach, Germany is being abolished."

121.     The memorandum, signed by Carter, indicated that it was approved by management witnesses specifically named in Stewart's EEOC complaint.

122.     Enclosed with the memorandum was a "survey form […] to determine [Stewart's] interest in relocating to Scott Air Force Base, Illinois where [she would] be non-competitively promoted to an Attorney Advisor (General), GS-0905-14 step 6,…with the Headquarters, Staff Judge Advocate Office."

123.     Stewart had already been promoted in 2006 to a GS-14, Step 6 and had risen to the level of a GS-14, Step 9 by June 2010. Stewart remained in the GS-14, Step 9 grade until 2012, when the Agency subsequently wrongfully demoted her to a GS-13.

124.     While the memorandum claims the transfer is a result of SDDC's "Global Manning Readiness initiative," the Agency has presented to the EEOC that the process to consolidate attorney positions at Scott Air Force Base had already been initiated eight (9) years ago in 2008.

125.     Accepting this position would translate into an approximately $30,000 loss in wages for Stewart and would require her to sell her home in Germany before she could accept another position in the U.S., where she will be required to rent or purchase a new home.

126.     If Stewart does not accept the new position, she will be removed from federal service and will lose all SOFA protections afforded to an Army employee in Germany (i.e., auto registration with the Armed Forces, driver's license under the SOFA, exemption from German taxes, etc.).

127.     If Stewart does not accept the new position, she will also be required to depart Germany within approximately 90 days of her separation from Federal Service, and will not be authorized to return to Germany for approximately another 90 days. Thus, Stewart will be forced

to take actions that would be detrimental to her personally, financially, and professionally (e.g., sell her home in Germany in a short period of time, close out bank and mortgage accounts, terminate personal contracts, etc.).

128.    However, most Army civilian employees who, like Stewart, are not under a rotation policy are only provided notices of a Reduction in Force ("RIF") after a thorough examination of requirements based on a proper reorganization plan.

129.    Any such plan must be approved by higher U.S. Army Headquarters, and plans for reorganizations in Europe must be vetted in accordance with the Overseas Force Structure Change rules.

130.    Should a previous requirement, such as the 598th BDE legal office, no longer be required at the BDE, then the employee should be given advance notice.

131.    Such advance notice should be given to the employee at least 18 to 24 months in advance to provide the employee sufficient time to search for another job, finalize her affairs in Europe; and, arrange for her transatlantic move.

132.    On the other hand, employees who are under a rotation policy have an end date to their overseas tour from the very beginning and can thus begin preparing for relocation back to the U.S. three years in advance.

133.    Even employees who have already settled into Germany, but who are later discovered to have committed misconduct or who cannot fulfill their conditions of employment (i.e., obtain and/or retain a security clearance for their job), are also afforded a generous amount of time to prepare for their relocation back to the U.S.

134.    The abrupt decision to abolish Stewart's position and require her to return to the U.S. within seven weeks creates the perception that Stewart is being punished for some type of

misconduct, which is incomprehensible given Stewart's stellar performance and general employment history.

135.    And, contrary to Notice of Abolishment, the 598th BDE Commander was informed earlier this year the SDDC Commanding General's plan was to decentralize and add several new positions to the BDE in Germany. In fact, the 598th BDE Commander had even requested that a paralegal be hired.

136.    In addition, positions are not typically abolished, as Stewart's has been in this case, without a concept plan of support for how legal services will be provided to the BDE if the legal office is closed.

137.    Stewart was informed that the abolishment of her position and the transfer to SDDC, if accepted, were to occur on or after November 12, 2017.

138.    This proposed transfer and removal violates the Army's policy on approvals regarding the removal of attorneys from their positions.

139.    The proposed transfer and removal is also in violation of the Department of Defense Instruction 1442, which requires consent of both losing and gaining supervisors.

140.    Stewart's current supervisor COL Curt Stewart (no relation) does not agree to the abolishment of the position or the BDE legal office. In fact, he has requested that Stewart be assigned a paralegal so that she can perform all the required legal duties for the BDE AOR.

141.    Stewart's supervisor told her that he believed the action was a reaction to her EEO complaints and settlement discussions.

142.    Confirming the Agency's retaliatory intent, on September 25, 2017, the Agency, finally responded to Stewart's settlement offer related to her EEOC complaint, stating it refused

to provide any counteroffer other than the September 18, 2017, memorandum that gives Stewart the option of a transfer or removal.

143.    Stewart then received a Corrected Notification of Position Abolishment dated September 29, 2017, which corrected the grade and pay scale of the SDDC position initially offered to Stewart from a GS-0905-14, step 6, to a GS-0905-14, step 9.

144.    The corrected position description still did not include any responsibilities related to International Law or to OCONUS centric issues, which are the focus of Stewart's current position at the 598th BDE.

### COUNT I

**Discrimination (Reprisal)**
**Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000(e),** *et seq.*

145.    Stewart hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

146.    Stewart is an "employee" as that term is defined in 42 U.S.C. § 2000(e) and the Army is an "executive agency" as that term is defined in 42 U.S.C. § 2000e-16.

147.    Stewart engaged in protected activity under Title VII through EEOC participation when she engaged in court-mandated settlement discussions in early September 2017.

148.    After Stewart provided the Agency her settlement demand, on September 18, 2017, the Agency notified Stewart that it was abolishing her position.

149.    The Agency provided no reasoning for its decision.

150.    And the Agency violated its own internal policies and procedures in executing this decision.

151.    Because of the temporal proximity to the settlement discussions ordered by the judge in Stewart's EEOC complaint, and because of all the multiple procedural inconsistencies in

abolishing Stewart's position, Stewart possesses a good-faith belief that this latest action is not only discriminatory, but also retaliatory and taken in direct response to Stewart engaging in protected EEO activity.

152.    For violations of the Civil Rights Act of 1964 - Title VII, 42 U.S.C. § 2000e-3(a), and pursuant to § 42 U.S.C.§ 2000e-5(g)(1), Stewart is entitled to such equitable relief as will effectuate the purposes of 42 U.S.C. §2000(e), *et seq.*

### PRAYER FOR RELIEF

153.    Wherefore, Plaintiff Katherine Stewart respectfully requests that this Court enter judgment in her favor and award her the following relief:

a. An order restraining Defendant from abolishing Plaintiff's current position pending the resolution of Plaintiff's administrative claims of discrimination, retaliation, and harassment—including the issue of the notice of abolishment of her position; and

b.  Reasonable attorneys' fees and costs.

Dated: October 6, 2017

Respectfully submitted,

R. Scott Oswald, DC Bar # 458859
Michael L. Vogelsang, Jr., DC Bar # 1000001
The Employment Law Group, P.C.
888 17th Street, N.W., 9th floor
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
mvogelsang@employmentlawgroup.com
*Counsel for Plaintiff*